

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DARRELL BROWN,                          )
                                        )
    Plaintiff,             )
                                        )
    v.                     )    **No. 11 C 5082**
                                        )
ERIC K. SHINSEKI, Secretary,            )    **Judge Ruben Castillo**
United States Department of             )
Veterans Affairs,                       )
                                        )
    Defendant.             )

## MEMORANDUM OPINION AND ORDER

Darrell Brown brings this suit against Eric K. Shinseki, Secretary of the United States Department of Veterans Affairs ("Defendant") alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (R. 1, Compl.) Presently before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (R. 15, Def.'s Mot.) For the reasons stated herein, Defendant's motion is granted and judgment is entered in favor of Defendant.

### RELEVANT FACTS[1]

Brown, a black male, began his employment with the Department of Veterans Affairs ("VA") on March 3, 2008, as a program support assistant. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 1.)

---

[1] The Court takes the undisputed material facts from the parties' Local Rule 56.1 Statements. (R. 17, Defendant's Local Rule 56.1 Statement of Material Facts ("Def.'s Facts"); R. 24, Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts ("Pl.'s Rule 56.1 Resp."); R. 23, Plaintiff's Local Rule 56.1 Statement of Additional Facts ("Pl.'s Add'l Facts"); R. 26-2, Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Additional Facts ("Def.'s Rule 56.1 Resp.")).

Brown reported to Cathy Spillner, a white female, the Administrative Officer in the Chief of Staff's Office at the North Chicago VA Medical Center. (*Id.* ¶ 2.) Spillner also supervised two white females, Beverly Bartley and Lynne Abney, and one Hispanic female, Donna Gonzalez. (*Id.*) Brown was hired to assist Abney in the credentialing process undertaken when the VA hired doctors to work at their facilities. (*Id.* ¶ 3.) Brown was the only male under Spillner's supervision and the only non-doctor working in the Chief of Staff's Office. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 35.) From the very first day that Brown commenced working in the Chief of Staff's Office Spillner began taking detailed notes concerning his performance and behavior. (*Id.* ¶ 39.)

Prior to taking the program support assistant position with the VA, Brown held another federal government job for the Military Medical Support Office, which was a GS-7 position. (*Id.* ¶ 36.) Brown took the program support assistant position because he believed that the credentialing specialist, which is a GS-11 position, would retire soon and that he would work underneath that person as her assistant. (*Id.* ¶ 37.) In short, Brown believed that the position with the VA would present a good career path opportunity. (*Id.*)

On or about April 28, 2008, Brown stopped by the desk of Alexis Allen, a black female, while on his way to see Spillner. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 4.) Allen also worked in the Chief of Staff's Office as a secretary, but she reported to Dr. Edwin Zarling. (*Id.* ¶ 5.) Brown was upset and frustrated about a contractor who brought him work to do, claiming that Spillner had told her to do so, and wanted to discuss protocol with Spillner. (*Id.* ¶ 4.) Brown claims that he said under his breath, "these people are so crazy, they make me want to hurt somebody." (*Id.* ¶ 6.) Allen was on the phone with a patient but she heard Brown's comment and told him to go ahead and take a break. (*Id.* ¶ 7.) Brown responded, "when [Spillner] come in, tell her I need to

2

talk to her." (*Id.*) Brown then went outside and took a cigarette break. (*Id.* ¶ 8.) After Brown's break he came back into the office and informed Allen that he was okay. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 5.) At the time Brown thought everything was fine. (*Id.*)

Later that day, Allen asked Bartley, the other secretary who sat in the same office area, if Brown was okay because he had come to her desk earlier and said he was so angry that he could "kill" someone. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 9.) Allen then went to Brown's desk to ask if he was alright. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 7.) He again stated that he was fine and told her not to worry about it and that he had cooled off. (*Id.*) Spillner testified that Bartley subsequently informed her of what Allen said Brown told her. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 10.) Bartley testified that it was actually Allen who informed Spillner about what Brown said. (*Id.*) Spillner was aware that Abney and Brown had recently exchanged emails wherein Abney had criticized Brown's work performance. (*Id.*) Spillner assumed that Brown had made the remark because of the emails and the stress of the situation. (*Id.*) Spillner dismissed the remark as she believed that Brown was merely venting and letting off steam, and she felt that he would calm down and things would be okay. (*Id.* ¶ 11.)

The next day, when Spillner walked over to the secretary's area, Bartley stopped Spillner and asked Allen to tell Spillner what Brown had said. (*Id.* ¶ 12.) Allen repeated Brown's

statement to Spillner. (*Id.*)[2] Spillner then asked Allen to write a report of contact but Allen declined, stating that she did not want to be involved. (*Id.* ¶ 13.) Spillner continued to believe that Brown was just venting and let it go. (*Id.*) At some point, Bartley told Abney about Brown's remark. (*Id.* ¶ 14.) Abney asked Bartley if Spillner was aware of the incident and Bartley said yes. (*Id.*) Abney told Bartley that she wanted to speak with Spillner the moment Spillner got to work. (*Id.*) Abney was shaken by the remark because of the work issues she had been having with Brown. (*Id.* ¶ 15.)[3] Later, Abney went to Spillner's office, crying uncontrollably, stating that she had heard about Brown's remark and was afraid for her life. (*Id.* ¶ 16.) Abney stated in her deposition that she had worked at the North Chicago VA Medical Center for many years and had never heard or dealt with threatening behavior like that of Brown. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 12.) Abney was upset by the situation and asked her supervisor to relocate her immediately. (*Id.*) Spillner made a report of contact regarding her

---

[2] Brown disputes this fact, asserting that Allen stated that she informed Bartley of Brown's remark, not Spillner. As support for his denial, Brown cites Allen's deposition at page 7, introduced into evidence as Defendant's Exhibit D. (R. 17-2, Def.'s Ex. D. at 7) In responding to the moving party's statement of facts, the nonmoving party must point to "specific references to the affidavits, parts of the record, and other supporting material." *See* L.R. 56.1(b)(3)(B). An adequate denial of a statement of fact must specifically admit or deny the relevant fact, cite to facts in support of the denial, and cite to specific references in an affidavit or other parts of the record that supports such a denial. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Here, the cited testimony does not support Brown's assertion that Allen told Bartley, not Spillner, of Brown's remark. Accordingly, Defendant's statement of fact is accepted as uncontroverted.

[3] Brown attempts to dispute this fact, asserting that he and Abney did not have any work problems. As support for his denial Brown cites his own deposition testimony, introduced into evidence as Plaintiff's Exhibit 2. (R. 23-1, Pl.'s Ex. 2 at 16-17) A self-serving deposition unsupported by facts in the record or contradicted by other record evidence is not sufficient to create a disputed issue of material fact. *See Alberio v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

meeting with Abney wherein she reported that Abney told her that she was afraid for her life, that her safety was compromised, and that she could no longer work with Brown. (*Id.* ¶ 14.) Spillner also reported that Abney became more upset as they discussed the situation and began to cry harder. (*Id.*) Spillner further reported that Abney told her that the "I am so angry I could kill someone" remark was directed towards Abney herself. (*Id.* ¶ 15.) After meeting with Abney, Spillner consulted with Human Resources for guidance. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 17.) Spillner was advised to report the incident to the VA Police and that an option was to reassign either Abney or Brown to another area until things calmed down. (*Id.*)

On April 30, 2008, Spillner asked Brown to come into her office wherein she informed him that someone told her that he said he was going to "kill" somebody. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 19.) She told him to pack his things. (*Id.*) Spillner drafted a letter of inquiry which she gave to Brown during this meeting, asking him to respond to it by the end of the day. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 18.) Brown denied threatening to kill anyone. (*Id.*) Spillner immediately transferred Brown to the Neurology Department ("Neurology") as a program service assistant, a position with the same title, wages, and benefits, and involving a slightly different type of office work. (*Id.* ¶ 19.) Brown found the job in Neurology fulfilling. (*Id.*) Neurology was located in the same building as the Chief of Staff's Office but on a different floor. (*Id.*) Spillner told Brown not to come to the Chief of Staff or Credentialing Office floor. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 19.) Prior to being transferred to Neurology, Brown had not received any formal write-

ups. (*Id.* ¶ 40.)[4]

Spillner reported Brown's remark to the VA Police, who investigated the incident and issued Brown a ticket for disorderly conduct. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 20.) The VA's Violence in the Workplace Policy at the North Chicago VA states: "[T]here shall be 'ZERO TOLERANCE' of violent, threatening, or intimidating behavior in the workplace. The intent of this policy is to maintain a safe work environment for all persons at the [North Chicago] Medical Center." (*Id.* ¶ 21.) Under the policy, violence and intimidation is defined as, among other things, "any verbal statement that can be perceived as threatening or potentially threatening." (*Id.*) The policy requires supervisors to report all incidents of violence and intimidation to the VA Police, who must investigate the report promptly. (*Id.* ¶ 22.) Additionally, employees who engage in such incidents are subject to arrest, citation, investigation, and/or relocation. (*Id.*) The policy further provides that "[a]ny person engaging in violence in the workplace shall be subject to progressive disciplinary action up to and including removal." (R. 26-2, Def.'s Rule 56.1 Resp ¶ 34.)

Following Brown's transfer to Neurology, he and Spillner exchanged approximately eight or nine emails about Spillner's belief that Brown had arrived late to work on several occasions. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 23.) On June 5, Spillner sent Brown an email complaining that he was late when he was, in fact, not late. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 26.) On or about June 6, 2008, Spillner sent Brown several emails complaining of him allegedly being tardy since

---

[4] Brown also claims that prior to his transfer to Neurology, he was unaware that Spillner had any issues with his behavior or performance. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 40). This is contradicted by Defendant's Exhibit J, which includes correspondence between Brown and Spillner that pre-dates Brown's transfer, and in which Spillner clearly expresses concerns and misgivings about Brown's performance and behavior. (R. 26-2, Def.'s Ex. J at 18-20.)

moving to Neurology. (*Id.*) Brown responded via email denying that he was late and asking when it was that he was allegedly late. (*Id.*) That same day, Spillner called Brown inquiring of his whereabouts and asking questions about his tardiness. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 24.) Spillner accused Brown of being rude and disrespectful on the phone which Brown denies. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 27.) On the same day, Spillner came to Neurology with a reprimand stating that Brown was late on March 10, 11 (which was his orientation), May 8, and June 5, 2008. (*Id.* ¶ 28.) This was Brown's first write-up. (*Id.*) Brown told Spillner that he had taken leave for any day that he was late. (*Id.*) Brown did not have to undergo a sign-in or punch-in process when coming to work. (*Id.*) Spillner also came over to Neurology on a few other occasions to talk to Brown about attendance issues. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 25.)[5] Brown considered the phone calls and emails from Spillner to be aggressive but they did not affect his work performance. (*Id.* ¶ 26.) Brown testified that the times Spillner physically came to Neurology put a damper on his day and affected his work performance because he would become upset by how those interactions transpired. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 29.)[6]

---

[5] Brown asserts that from around May 2 to May 15, 2008, while he was working in Neurology, Spillner approached him on a daily basis making remarks similar to, "Darrell you know you said it." (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 25.) He also alleges that he continued to tell Spillner that he did not make any threatening statements. (*Id.*) As support for this proposition Brown cites his deposition testimony at pages 31-32, introduced into evidence as Plaintiff's Exhibit 2, and paragraph 8 of his declaration, introduced into evidence as Plaintiff's Exhibit 1. (R. 23-1, Pl.'s Ex. 2 at 31-32; R. 23-6, Pl.'s Ex. 1 ¶ 8.) Although Brown was asked about Spillner's alleged daily visits at his deposition, he never mentioned any harassing remarks by her. Brown cannot use a declaration to contradict his own earlier deposition testimony. *See Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994) (the nonmoving party cannot try to manufacture a disputed issue of material fact by issuing declarations that contradict their own prior deposition testimony).

[6] Defendant attempts to dispute this fact by drawing the Court's attention to the portion of Brown's deposition testimony in which he said that Spillner's visits "didn't affect [his] work

On June 10, 2008, Brown went to court on the ticket issued by the VA Police. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 27.) The officer who issued the ticket attended the hearing, but the judge dismissed the matter. (*Id.*) Abney was asked if she wished to attend court but she refused, citing her desire to stay away from the situation as much as possible. (*Id.* ¶ 28.) Bartley, Allen, and Spillner also did not attend court on June 10, 2008. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 22.) Allen stated in her deposition that she felt the situation was blown out of proportion because Brown made a comment to her and she did not herself feel threatened. (*Id.* ¶ 23.) Bartley stated in her deposition that she felt like she was being dragged into something that she did not have any part of. (*Id.*)

Sometime during March or April 2008, Abney and Bartley reported to Spillner that Brown smelled of alcohol. (*Id.* ¶ 32.) Spillner went to Brown to verify the claim but she could not smell alcohol on him. (*Id.*) Spillner stated during her deposition that she did not think that the allegations were warranted and therefore did not follow through on them. (*Id.*) Brown claims that he does not drink alcohol because he is a diabetic. (*Id.*) At Spillner's deposition, when she was asked about the allegations made against Brown that he smelled like alcohol she stated, "Actually, I think he is confusing dates and times and situations because on April 30th, that was never discussed. It was never brought up. It was never discussed at any point in time." (*Id.* ¶ 33.) However, in Spillner's April 30, 2008, report of contact with Abney she wrote, "[Abney] also stated that she smelled alcohol on him on one occasion and that on Monday morning[] he had come to work with blood-shot eyes." (*Id.*)

---

performance." (R. 23-1, Pl.'s Ex. 2 at 47.) However on the same page of testimony Brown testified that Spillner's physical visits to the Department did affect his performance. (*Id.*)

On June 13, 2008, Spillner came to Neurology and attempted to serve Brown with a notice of proposed removal based on two reasons: making a disruptive remark in the workplace on April 28, 2008, and disrespectful conduct during his conversation with Spillner about tardiness on June 6, 2008. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 29.) Brown told Spillner that he felt threatened, jumped up, went into another room where a patient was being treated, and called the VA Police. (*Id.* ¶ 30.) Spillner left Neurology but returned later with another doctor and told Brown that he was being sent home for thirty days. (*Id.*) Hence, the notice of proposed removal was reduced to a thirty-day suspension without pay. (R. 26-2, Def.'s Rule 56.1 Resp. ¶ 31.) The VA later notified Brown that effective September 8, 2008, he was being reassigned to the Mental Health Department in another building. (R. 24, Pl.'s Rule 56.1 Resp. ¶ 31.) Brown maintained the same title, pay grade, and benefits when he was transferred to the Mental Health Department, with similar office-type work. (*Id.* ¶ 32.) Brown loved working in the Mental Health Department and had no issues or concerns there. (*Id.*) Brown resigned from the VA in March 2009 to work for the Navy because he wanted a better position in a different agency. (*Id.* ¶ 33.)

In September 2008, Brown filed a formal complaint of discrimination with the VA, alleging that he was subjected to harassment and a hostile work environment because of his race and gender when Spillner accused him of disorderly conduct, when the VA Police issued him a ticket for disorderly conduct, and when he was temporarily reassigned to Neurology. (*Id.* ¶ 34.) Brown felt that when assigning him tasks Abney read to him like he could not do so on his own and took tiny steps on projects as if he were slow. (*Id.* ¶ 35.) Brown also took issue with Bartley commenting that he was not going to be paid extra for coming to work early, and for assigning him secretarial-type work which she marked up with red ink. (*Id.* ¶ 36.) Furthermore, Brown

believed that Spillner was a social worker who kept a journal about him from his first day of employment in an effort to prove that he, a veteran, was "a basketcase or needed help." (*Id.* ¶ 37.) Brown thought that Spillner had problems with him because he was a male veteran, not because he was black. (*Id.* ¶ 38.)[7] Brown felt that Spillner harassed him and not other female employees because she was intimidated by his military background and knowledge of human resources administration. (*Id.* ¶ 39.) Brown did not complain to anyone at the VA about harassment until June 2008, after the ticket had been dismissed and he filed his informal Equal Employment Opportunity ("EEO") complaint. (*Id.* ¶ 40.) The administrative law judge granted the VA's motion for summary judgment on all of Brown's claims asserted in his formal EEO complaint. (R. 6, Def.'s Answer at ¶ 11.)

## PROCEDURAL HISTORY

On July 27, 2011, Brown initiated this action by filing a two-count complaint. (R. 1, Compl.) In Count I, Brown alleges a claim of hostile work environment based on race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (*Id.* ¶¶ 7-13.) In Count II, Brown avers a claim of disparate treatment based on sex discrimination also in violation of Title VII. (*Id.* ¶¶ 14-23.)

Defendant filed a motion for summary judgment on March 19, 2012. (R. 15, Def.'s Mot.) In his motion, Defendant argues that he is entitled to judgment as a matter of law because Brown cannot establish: (1) his claim of sex discrimination using either the direct or indirect methods of

---

[7] Brown attempts to dispute this fact, arguing that he also said Spillner had problems with him because of his race and gender. As support for his denial Brown cites pages 60 and 66 of his deposition testimony, introduced into evidence as Plaintiff's Exhibit 2. (R. 23-1, Pl.'s Ex. 2, at 60, 66.) In the portion of the transcript to which Brown cites he explicitly states that he did not feel that Spillner had an issue with him because of his race. (*Id.*).

proof; or, (2) his claim of hostile work environment on the basis of race discrimination. (R. 16, Def.'s Mem. at 1.) In response to Defendant's motion, Brown contends that Defendant is not entitled to summary judgment because a reasonable finder of fact could conclude based on the evidence presented that Defendant's conduct was motivated by Brown's race and sex, and that it caused him to suffer a hostile work environment and to be disparately treated as compared to his white, female co-workers. (R. 25, Pl.'s Mem. at 2.) Thus, Brown contends that there are genuine issues of material fact in dispute and that therefore judgment as a matter of law cannot be entered in Defendant's favor.

## LEGAL STANDARD

In deciding a motion for summary judgment the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead it is the function of this Court in deciding a motion for summary judgment to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Omnicare Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). The moving party has the initial burden of demonstrating that it is entitled

11

to judgment as a matter of law. *See Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *see also Celotex Corp.*, 477 U.S. at 322. The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Branzinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993). Once the moving party has met this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party may not rely on mere conclusions or allegations to create a genuinely disputed issue of material fact. *See Bladerston v. Fairbanks Morse Engine Div. of Coltec Ind.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can mere speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)). In order to defeat a motion for summary judgment the nonmoving party "must make a showing sufficient to establish any essential element of [his] cause of action for which [he] will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997); *see also Celotex Corp.*, 477 U.S. at 322-23. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for [it]." *Wheeler*, 539 F.3d at 634.

On summary judgment the Court limits its analysis of the facts to the evidence that is supported by the parties' Local Rule 56.1 Statements properly before the Court. *See F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005); *Bordelon v. Chi. Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). When a proposed statement of fact is supported by the record and not adequately controverted by the opposing party, the Court will accept that

statement as true. *See Alberio*, 246 F.3d at 933. To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *See id; see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006). Factual disputes "are genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmovant." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 676 (7th Cir. 2001) (internal citations and quotation marks omitted). The existence of a materially disputed issue of fact will be sufficient to avoid summary judgment only if the disputed fact is determinative of the outcome under the applicable law. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## ANALYSIS

### I.    Hostile work environment claim (Count I)

In Count I, Brown alleges that he was harassed by his white female supervisor and co-workers—Spillner, Bartley, and Abney—when they allegedly conspired to wrongfully accuse him of threatening to kill another female co-worker and criticized his work performance and attendance. (R. 1, Compl. ¶ 7.) According to Brown, he was subjected to a hostile work environment on the basis of his race in violation of Title VII. (*Id.*) Title VII makes it unlawful to discriminate against an employee because of his race. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer to. . .discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . ."). In order to establish a hostile work environment claim pursuant to Title

VII a plaintiff must prove: (1) that his work environment was both objectively and subjectively offensive; (2) that the harassment was based on his race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability. *See Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011); *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quoting *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004)).

A hostile work environment is one in which the harassment is sufficiently "severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). In determining whether a work environment is hostile the Court looks to the totality of the circumstances. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Russell v. Bd. of Trustees of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001). Those circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "Indeed, the threshold for plaintiffs is high, as the workplace that is actionable is one that is hellish." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation marks omitted).

To establish that the alleged conduct was "severe or pervasive," the plaintiff must prove that "the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being[.]" *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004) (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)). "Ultimately, to satisfy the 'severe or pervasive' prong, the plaintiff must show that the work environment was

14

both subjectively and objectively offensive." *Smith*, 388 F.3d at 566 (citing *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003)). An objectively offensive work environment is one that a reasonable person would find hostile or abusive. *See Harris*, 510 U.S. at 21. A subjectively offensive work environment is one that the plaintiff perceives to be hostile or abusive. *See id.*

Defendant argues that Brown cannot prove the third element of a hostile work environment claim, that the conduct was either severe or pervasive, because he lacks evidence to do so and therefore Defendant has met his initial burden on summary judgment. (R. 16, Def.'s Mem. at 15-16.) *See Branzinski*, 6 F.3d at 1183. Brown argues that his personal humiliation of being accused of workplace violence, the receipt of a disorderly conduct ticket, his transfer to Neurology, and his occasional interactions with Spillner, constitute conduct so severe that it altered the terms of his employment. (R. 25, Def.'s Mem. at 15.) The Court finds, however, that this conduct does not constitute the type of conduct necessary to sustain a hostile work environment claim. Conduct that has been found to rise to the level of establishing such a claim includes physical assaults, *see Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008), inappropriate comments such as "would you like to have sex with me," "will you have sex with me," and "most Mexicans are pigs," combined with "serious physical violations," *see Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407–08 (7th Cir. 2005), supervisors and employees referring to an employee by the term "nigger" between five and ten times while he was employed, *see Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 673 (7th Cir. 1993), repeated harassment on the basis of an employee's race and religion, including referring to the employee as a "haughty jew," and stating "I know how to put you jews into place," *see Shanoff v. Illinois*

15

*Dept. of Human Serv.*, 258 F.3d 696, 698-99 (7th Cir. 2001), inappropriate sexual touching, sexually charged comments, and alleged stalking, *see Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006), and "uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures," *see Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Here, Brown does not allege that he was physically assaulted, that anyone made serious verbal attacks on him, that any of his co-workers made derogatory remarks about his race, that he was the victim of uninvited sexual solicitations, that his co-workers aimed intimidating words or acts at him, or that any of his co-workers used obscene language or gestures towards him. Therefore, the conduct he complains of was not so severe and pervasive so as to establish a hostile work environment claim. *See Coolidge v. Consol. City of Indianapolis*, 505 F.3d 731, 734 (7th Cir. 2007) (finding exposure to pornography depicting necrophilia did not create a hostile work environment in a crime lab); *Mannie v. Potter*, 394 F.3d 977, 982-83 (7th Cir. 2005) (rejecting plaintiff's hostile work environment claim alleging that her supervisor made derogatory statements about her, discussed her mental condition with other employees, and paged her to return from cigarette breaks); *Silk v. City of Chicago*, 194 F.3d 788, 803-07 (7th Cir. 1999) (rejecting plaintiff's hostile work environment claim alleging verbal abuse, threats of physical violence, lowered performance ratings, loss of leave days, and exclusion from supervisory duties). The conduct at issue in this case, like that in *Silk*, 194 F.3d at 803-07, does not give rise to a severe or pervasively hostile work environment so abusive that it altered the conditions of Brown's employment. In *Silk*, *id*, the plaintiff alleged that his supervisors subjected him to pervasive verbal harassment, threats of physical violence, lowered his performance rating, changed his job position, and excluded him from administrative duties,

which the court held did not give rise to a hostile work environment. The plaintiff in *Silk*, unlike

Brown, was subjected to verbal harassment, threats of physical violence, and loss of leave days.

As in this case, Silk's administrative duties were altered but not to an extent evidencing a

"dramatic shift in skill level to perform his job responsibilities." *Id.* At 807 (internal quotation

marks omitted). Therefore, Brown cannot establish that Defendant's conduct was so severe that

it altered the terms of his employment.

Seeking to avoid this result, Brown also asserts that the occasional criticism by Abney

and Bartley and the discussions regarding attendance he had with Spillner constitute "severe and

pervasive" conduct. (R. 16, Def.'s Mem. at 8.) (citing *Silk*, 194 F.3d at 804). The Court finds,

however, that none of that conduct rises to the level of severe or pervasive. First, Brown

admitted that most of Spillner's allegedly harassing behavior did not affect his work

performance. (R. 26-1, Def.'s Reply Mem. at 6.) This concession is nearly fatal to his hostile

work environment claim. *See Harris*, 510 U.S. at 21-22 ("Likewise, if the victim does not

subjectively perceive the environment to be abusive, the conduct has not actually altered the

conditions of the victim's employment, and there is no Title VII violation."). Second, Brown has

offered no evidence that any of the actions that he maintains gave rise to a hostile work

environment were motivated by, or had anything to do with, his race. (R. 16, Def.'s Mem. at 8.)

Rather, at his deposition, Brown testified that he believed that his veteran status, and *not* his race,

was the basis for Spillner's conduct towards him. (*Id.*) Absent evidence of actionable

harassment by either his supervisor or his co-workers based on his race, Brown cannot establish a

hostile work environment claim. *See Vance*, 646 F.3d at 470 (plaintiff failed to allege a hostile

work environment claim because she could not demonstrate that the defendant's conduct "was

17

motivated by, or had anything to do with, race"). In sum, Brown's lack of evidence suggesting

that he suffered an allegedly hostile work environment because of his race, and his admission that

it was his veteran status and not his race that motivated Spillner's allegedly harassing actions, are

fatal to his claim of a hostile work environment on the basis of race discrimination in violation of

Title VII. *See id.*

## II.     Disparate treatment claim (Count II)

In Count II, Brown alleges that he was discriminated against on the basis of his sex and

treated dissimilarly from his female co-workers, giving rise to a disparate treatment claim. (R. 1,

Compl. ¶ 15.) Title VII makes it unlawful to discriminate against an employee on the basis of his

sex. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an

employer to. . .discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's. . .sex. . ."). "Disparate

treatment, the most easily understood type of discrimination, occurs when a plaintiff is

intentionally treated less favorably than others simply because of his race, color, religion, sex, or

national origin" *Vitug v. Multistate Tax Com'n*, 88 F.3d 506, 513 (7th Cir. 1996) (internal

quotation marks omitted). A disparate treatment claim requires the plaintiff to prove that the

defendant acted with actual discriminatory intent. *See Watson v. Fort Worth Bank & Trust*, 487

U.S. 977, 986 (1988).

A plaintiff alleging a Title VII claim of disparate treatment on the basis of sex can prove

his case using either the direct method of proof or the indirect, burden-shifting method of proof

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Coleman

v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *see also Atanus v. Perry*, 520 F.3d 662, 671 (7th

Cir. 2008). Under the direct method of proof, a plaintiff may show, through either direct evidence or a convincing mosaic of circumstantial evidence, that his employer took an adverse employment action against him because of his sex. *See Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2007); *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). The inquiry under the direct method of proof is whether the evidence points directly towards a discriminatory reason for the employer's actions, without reliance on speculation. *See Atanus*, 520 F.3d at 671; *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Direct evidence of discrimination in violation of Title VII usually takes the form of an admission by the relevant decision-maker that the plaintiff was discriminated against because of his sex. *See Hossack*, 492 F.3d at 861. Because most employers are careful not to openly discriminate, nor to publicly admit that they do, courts allow plaintiffs to therefore point to circumstantial evidence of discriminatory intent under the direct method of proof. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). To prove sex discrimination using circumstantial evidence under the direct method of proof the plaintiff must construct a convincing mosaic that "allows a jury to infer intentional discrimination by a decision maker." *Rhodes*, 359 F.3d at 504 (internal quotation marks omitted). "That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Id.* (internal quotation marks omitted). "There are three categories of circumstantial evidence under the 'convincing mosaic' approach: (1) suspicious timing, ambiguous statements and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570

19

(7th Cir. 2012) (citing *Coleman*, 667 F.3d at 860).

Under the *McDonnell Douglas* indirect, burden-shifting method of proof, the plaintiff must first establish a *prima facie* case of discrimination by proving: (1) that he was a member of a protected class; (2) that he was meeting his employer's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that other similarly situated employees who were not members of the protected class were treated more favorably than he was. *See Coleman*, 667 F.3d at 845 (quoting *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)); *Vitug*, 88 F.3d at 515; *see also McDonnell Douglas Corp.*, 411 U.S. at 802 ("The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of [sex] discrimination."). Summary judgment is proper if the plaintiff fails to establish any of the four elements of a *prima facie* case of discrimination. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). If the plaintiff can establish a *prima facie* case of discrimination, a presumption of discrimination is triggered, and the burden then shifts to the employer to articulate some legitimate, noninvidious reason for taking the adverse employment action against the plaintiff. *See Coleman*, 667 F.3d at 845; *Vitug*, 88 F.3d at 515. "As with other rebuttable presumptions, although the burden of production is shifted to the defendants, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Vitug*, 88 F.3d at 515 (internal quotation marks omitted). If the employer has a legitimate, noninvidious justification for its action, the burden then shifts back to the plaintiff to show that the employer's legitimate, noninvidious reason for its action is a mere pretext for discrimination, "which in turn permits an inference of unlawful discrimination." *Coleman*, 667 F.3d at 845; *see also Vitug*, 88 F.3d at 515; *McDonnell Douglas Corp.*, 411 U.S.

at 804. Brown argues that he can establish his claim of disparate treatment on the basis of sex under both the direct and indirect methods of proof. (R. 25, Pl.'s Mem. at 8.)

### A. Brown's disparate treatment claim under the direct method of proof

Brown avers that he can establish that he was discriminated against on account of his sex under the direct method of proof by using a convincing mosaic of circumstantial evidence. (*Id.* at 8-11.) Brown contends that he "was moved to a position where he had different duties, transferred to a different floor in an entirely different department, told he could not return, had the police called on him, and issued a ticket for disorderly conduct based on a statement he allegedly made under his breath, which was clearly not directed at anyone and did not at all threaten or intimidate the individual who overheard it." (*Id.* at 9.) He contends that the only person who had a problem with his comment was Abney, "who had nothing to do with the comment, did not hear the comment, and did not even find out about the comment until a day or two after it was said." (*Id.*) Brown questions the genuineness of Abney's impressions and beliefs about his comment and asserts that "it is hard to understand how Spillner could validate Abney's 'fear for her life' by removing [him] from the floor and department entirely, when there was no basis for believing [his] comment had anything to do with Abney." (*Id.*) Brown argues that there "is zero testimony from Spillner, Abney, and Bartley, that the one person who actually heard [his] comment, Allen, had provided them with any background information or context that might reveal the cause of [his] frustration." (*Id.*) Instead, Brown claims that "Abney and Spillner conjured up the cause for [his] comment by way of pure speculation." (*Id.* at 9-10.) Brown argues that even assuming Spillner's version of his comment is taken as true, he only said

that he *could* "kill" someone, not that he *would* "kill" someone, and that therefore his comment can hardly be considered a threat. (*Id.* at 10.)

Brown further argues that once Abney came to Spillner with her concerns about his remark, Spillner decided to transfer him rather than Abney, despite the fact that Abney asked to be relocated. (*Id.* at 10.) He asserts that at the time Spillner made the decision to transfer him she had not consulted with him about the comment. (*Id.*) Brown argues that Spillner made no effort to explain to Abney that she was overreacting, despite the fact that Spillner herself thought Brown was just "venting." (*Id.*) He further asserts that Spillner should have been more skeptical of Abney's professed fear in light of the fact that "Spillner, by her own admission, was aware that Abney made an unwarranted allegation against [him] that he smelled like alcohol." (*Id.*)

Brown asserts that "[p]erhaps the most compelling piece of circumstantial evidence to prove [his] case are Spillner's own notes." (*Id.*) Brown alleges that throughout the notes "Spillner ominously spews criticism and negativity in exquisite detail without so much as one word of praise." (*Id.*) Brown argues that Spillner's notes are illogical in light of the fact that he did not receive a single write-up during his first two months of working under her. (*Id.* at 10-11.) He alleges that it is "suspicious that Spillner would keep such detailed notes about behavior she found so intolerable without disciplining him." (*Id.* at 11.) Brown argues that a reasonable finder of fact could determine from this evidence that Spillner "was making preparations to terminate [him] from the very first day he came to work." (*Id.*) He further asserts that "[c]onsidering the only thing we can be certain Spillner knew of [him] on his first day was that he was a [b]lack male, a reasonable factfinder could also infer discriminatory intent on the part of Spillner." (*Id.*) His final piece of circumstantial evidence "showing Spillner's discriminatory intent is her sworn

testimony that the issue of alcohol was not brought up on the day that [he] was transferred to Neurology, yet her own report of contact with Abney that same day [is] in direct contradiction with that statement." (*Id.*)

Brown's attempt to assemble a convincing mosaic of circumstantial evidence does not point to discriminatory intent by any decisionmaker, let alone pretext. Rather, the undisputed material facts establish that Brown's supervisor, Spillner, followed the agency's rules for addressing threats of potential violence in the workplace, and that Brown's sex did not factor into her decisionmaking process. Brown concedes that he was visibly upset and frustrated when commenting that "these people are so crazy, they make me want to hurt someone," while standing in front of Allen's desk. (R. 24, Pl.'s Rule 56.1 Resp. ¶¶ 4, 6.) Brown now characterizes his comment as harmless venting and argues that Spillner should have done the same because the statement was not directed at a specific individual and because Allen never felt threatened or intimidated herself. (R. 25, Pl.'s Mem. at 9.) However, as Defendant points out, the VA's Violence in the Workplace Policy broadly defines violence and intimidation to include "any verbal statement that can be perceived as threatening or potentially threatening." (R. 26-1, Def's Reply Mem. at 2; R. 17-2, Def.'s Facts, Ex. G.) Angry employees threatening to "hurt" (and certainly threatening to "kill") their co-workers are undoubtedly engaging in potentially threatening behavior. *See Merheb v. Ill. State Toll Highway Auth.*, 267 F.3d 710, 713-14 (7th Cir. 2001) (Title VII employee's threatening statement to "do something" about a co-worker which caused fear in his co-workers was a legitimate, noninvidious grounds for termination, even where the statement was not intended as a threat); *see, e.g., Palmer v. Circuit Court of Cook Cnty., Soc. Serv. Dept.*, 905 F. Supp. 499, 509 (N.D. Ill. 1995) ("The essential functions of any

job include avoidance of violent behavior that threatens the safety of other employees."). As

Defendant argues, it "is therefore disingenuous for Brown to suggest that the [VA's] decision to

not dismiss his statement as mere talk is evidence of discrimination." (R. 26-1, Def.'s Reply

Mem. at 2.) *See Merheb*, 267 F.3d at 713-14 (threatening statement by employee that caused fear

in his co-workers for their safety was a legitimate, nondiscriminatory reason for firing him);

*Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (plaintiff's "belligerent and

improper conduct towards his coworkers and supervisors [was a] legitimate, non-discriminatory

reason" for taking adverse employment action against him, and communications made in the

form of threats of violence, even if made during the course of otherwise protected activity, are

removed from protection).

Defendant argues that "it was [Brown's] co-worker Allen, the one person who had

actually seen Brown's demeanor, heard his tone of voice, and was aware of his prior conflicts

with other employees, who spread the statement as she asked . . . Bartley about Brown's well-

being." (R. 26-1, Def.'s Reply Mem. at 2-3.) Defendant further contends that "Brown's

statement was no insignificant matter to his co-workers, as the next day, at Bartley's urging,

Allen repeated the statement to Spillner, and sometime thereafter, Bartley told Lynne Abney, the

very person with whom Brown worked most closely and had issues." (*Id.* at 3.) Defendant has

met his initial burden on summary judgment of establishing that he is entitled to judgment as a

matter of law. *See Wheeler*, 539 F.3d at 634. Nevertheless, Brown maintains that the record

does not contain any testimony from Spillner, Bartley, or Abney that Allen told them anything

that would have led them to conclude that the comment was directed at Abney. (R. 25, Pl.'s

Mem. at 9-10.) Brown's mere speculation, however, cannot create a genuine issue of disputed

fact and cannot be relied on here to avoid his obligation as the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Alberio*, 246 F.3d at 932; *see also Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("statements that are the result of speculation or conjecture or merely conclusory" cannot be used to avoid summary judgment). Therefore, Brown cannot establish that Spillner's conduct was suspect because his argument is based on mere conjecture and speculation, and is not established by any factual support in the record.

As to the matter of Spillner's notes, Brown fails to cite to a single piece of evidence in the record to bolster his contention that Spillner's response to his comment, nearly two months later, was motivated by sex discrimination. These unsubstantiated allegations about a supervisor, without evidence that the supervisor's decision was motivated by illicit factors, cannot defeat summary judgment. *See Adams*, 324 F.3d at 940. The undisputed facts reveal that Spillner became aware of the comment the day after it was made, and therefore Spillner could have immediately disciplined Brown under the VA's Violence in the Workplace Policy, but declined to do so. Instead, Spillner acted only after Abney continued to express fear for her personal safety and after Human Resources advised her to call the VA Police. Even after taking such actions, Spillner still did not terminate Brown's employment but rather temporarily reassigned him to another department and position with the same title, wages, and benefits where he would be performing a similar type of office work.

"The mosaic of evidence which permits an inference of discriminatory intent usually consists of evidence of ambiguous statements, suspicious timing, discrimination against other employees and other pieces of evidence nonconclusive in itself but together composing a

convincing mosaic of discrimination against the plaintiff." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 725 (7th Cir. 1998) (internal quotation marks omitted). Brown has not identified suspicious timing, ambiguous statements, or any other behavior or comments directed at males from which an inference of discriminatory intent might be drawn. *See id.* Indeed, Brown has not established any action on the part of Defendant that can reasonably be said to have been taken *because of* rather than *in spite of* his sex. Accordingly, the Court finds that Brown has failed to present a convincing mosaic of circumstantial evidence pointing directly towards discrimination, and therefore the "bits and pieces" of circumstantial evidence that Brown relies upon to establish his case under the direct method of proof fall short of creating a reasonable inference of discriminatory intent that is required to prevail under that method. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (summary judgment was proper against Title VII plaintiff where the evidence offered by the plaintiff under the direct method of proof was that the defendant demoted certain employees rather than terminated them and provided inconsistent reasons for departing from its demotion policy, even though "one might guess or speculate that perhaps [the employee's] race might have made a difference in the decision, but guesswork and speculation are not enough to avoid summary judgment."); *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (summary judgment properly entered against Title VII plaintiff alleging national origin discrimination under the direct method of proof where the convincing mosaic of circumstantial evidence included the fact that (1) the plaintiff's employer knew that the plaintiff's grievance was valid, yet vehemently opposed it; (2) the plaintiff's supervisor assigned her to a bad position; and (3) the plaintiff's supervisor sent someone to observe and report on the plaintiff three times in one day, because this evidence did

not point directly towards discrimination); *Harris v. Warrick Cnty. Sheriff's Dept.*, 666 F.3d 444, 448 (7th Cir. 2012) (black plaintiff could not succeed on his Title VII claim under the direct method of proof where the evidence submitted to support his claim was that of a racially charged workplace and better treatment for similarly situated white employees because the evidence of a racially charged workplace did not point directly towards discriminatory conduct by his supervisor and because the white employees were not, in fact, similarly situated to the plaintiff because they did not violate standard operating procedures, disobey direct orders, or show a lack of commitment to their job); *Winsley v. Cook Cnty.*, 563 F.3d 598, 604-05 (7th Cir. 2009) (summary judgment was appropriately entered against the plaintiff on her Title VII claims under the direct method of proof where the only evidence offered by the plaintiff was her own deposition testimony, which provided neither direct nor circumstantial evidence that her employer discriminated against her on an illegal basis); *Walker v. Bd. of Regents of Univ. of Wisc. Sys.*, 410 F.3d 387, 396-97 (7th Cir. 2005) (jury could not return a verdict for the plaintiff on her Title VII claim using the direct method of proof without indulging in pure speculation where, though she may have been able to point to some inconsistencies and idiosyncracies in her employer's dealings with her, nothing in the record suggested that the ultimate decision to take adverse action against her was rooted in anything other than legitimate differences and performance-related concerns). Therefore, Brown cannot establish discrimination on the basis of sex in violation of Title VII using the direct method of proof.

**B.     Brown's disparate treatment claim under the indirect method of proof**

Brown also argues that he can forestall summary judgment using the *McDonnell Douglas* indirect, burden-shifting method of proof. (R. 25, Pl.'s Mem. at 13-14). As support for his claim

he cites the same evidence that he attempts to use to support his claim under the direct method of proof to demonstrate that Defendant's stated legitimate, noninvidious reason for taking adverse action against him is pretextual. (*Id.* at 14). Defendant does not argue that Brown fails to meet the first prong of the *prima facie* case of discrimination, as he is a member of a protected class as a white male. (R. 26-1, Def.'s Reply Mem. at 4 n.4.) Nor does Defendant dispute that Brown meets the third prong of the *prima facie* case, as his thirty-day suspension without pay could constitute an actionable adverse employment action. (*Id.*) Rather, Defendant argues that Brown fails to meet the second and fourth prongs of a *prima facie* case of discrimination. (R. 16, Def.'s Mem. at 9-10.)

Brown again asserts that his comment "could hardly be considered an incident of 'violence in the workplace' or 'threatening' in this case, especially when the statement was made under his breath on a single occasion in front of one individual who did not feel threatened." (R-25, Pl.'s Mem. at 13-14.) Brown further argues that he "did not 'admit' he made this comment at the time the adverse employment actions were taken. Rather, he denied, and still denies, that he stated he could 'kill' someone, and only admitted he said he could 'hurt' someone at his deposition, after the adverse employment actions were taken." (*Id.* at 14.) Therefore, Brown disputes that he was not meeting his employer's legitimate job expectations. (*Id.* at 13.) Finally, Brown argues that Abney was treated more favorably than he was when Spillner decided to transfer him, rather than Abney, even after Abney requested that she be relocated. (*Id.* at 14.) Thus, Brown appears to contend that a similarly situated employee outside of the protected class to which he belongs, Abney, was treated more favorably than he was.

The Court finds that Brown has failed to establish a *prima facie* case of discrimination

because he has not proffered evidence demonstrating that a similarly situated employee outside of the protected class was treated more favorably than he was, or evidence that he was meeting his employer's legitimate job expectations. In order to meet his burden under the indirect method, Brown must establish a *prima facie* case by showing, *inter alia*, that a comparable employee outside of the protected class received better treatment than he did. *See McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009); *Adams*, 324 F.3d at 939. To demonstrate a similarly situated employee, Brown must point to someone who "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 618. In the context of disciplinary action, the Court usually relies on evidence that the employees engaged in similar conduct, were subject to the same performance standards, and dealt with the same supervisor. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 688 (7th Cir. 2007). Because there is no evidence in the record that Abney also engaged in disruptive behavior in the workplace and was not disciplined, she is not a proper comparator. *See Lampley v. Pollution Control Indus. of Am.*, 353 F. App'x 42, 43-44 (7th Cir. 2009) (Title VII plaintiff not similarly situated to his comparators because he made threatening statements in the workplace whereas his comparators made rude or obscene statements but not threatening ones); *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (*prima facie* case not met where terminated employee could not show a co-worker with a "comparable set of failings"); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301 (7th Cir. 2004) (other employees could not be considered similarly situated without evidence that they engaged in similar conduct but were not subjected to the same disciplinary measures); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003)

(employees not similarly situated because eating a co-worker's pudding was not comparable to stealing employer's money); *Radue*, 219 F.3d at 618-19 (plaintiff's substantial performance problems precluded a finding that he was similarly situated to his comparators). Therefore, Brown cannot establish that a similarly situated employee outside of the protected class was treated more favorably than he was.

Furthermore, even if Abney were a proper comparator, Brown was not meeting the VA's legitimate expectations of him. Rather, in telling a co-worker that he wanted to "hurt" somebody, he clearly violated the VA's Violence in the Workplace Policy. *See Lampley*, 353 F. App'x at 43-44 (threatening comment made by Title VII plaintiff to his supervisor was a legitimate, non-discriminatory reason for taking adverse action against him); *Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) (employee who violated his company's written policy held not to have met his employer's legitimate expectations); *Merheb*, 267 F.3d at 713-14 (employee who made a threatening statement in the workplace was not meeting his employer's legitimate expectations of him); *see, e.g., Miller v. Univ. of Chi.*, No. 05 C 1663, 2007 WL 317028, at *10 (N.D. Ill. Jan. 29, 2007) (Title VII plaintiff's threatening comments made to a co-worker constituted a legitimate, noninvidious reason for his termination). Thus, Brown cannot establish that he was meeting his employer's legitimate job expectations. Because Brown suffers from an absence of proof on two of the essential elements of a *prima facie* case of discrimination, he cannot meet his burden under the *McDonnell Douglas* framework and accordingly summary judgment is proper. *See Kampmier*, 472 F.3d at 939 (summary judgment is proper where a Title VII plaintiff fails to establish any of the elements of a *prima facie* case of discrimination).

**C.    Pretext**

Even if Brown could establish a *prima facie* case of discrimination, he cannot demonstrate that the VA's legitimate, non-discriminatory reason for transferring and later disciplining him is pretextual. The VA took adverse employment action against Brown for making a violent remark in the workplace and for being rude to his supervisor, Spillner, during a phone call regarding his alleged tardiness. Pretext means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). To demonstrate pretext, Brown must show "either that a discriminatory reason more likely motivated the [VA] or that [its] explanation is unworthy of credence." *Debs v. Ne. Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). Under well-settled principles of employment law, this Court does not "sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make." *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002); *accord Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999) ("[W]e do not sit as a superpersonnel department that reexamines an entity's business decisions, [r]ather, we must determine whether the employer gave an honest explanation of its behavior.") (internal citations and quotation marks omitted); *see also Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987); *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). Courts are not concerned with "whether or not the employer's actions were mistaken, ill considered, or foolish, so long as the employer honestly believed those reasons." *Burks*, 464 F.3d at 754 (internal quotation marks omitted). It does not matter whether the VA made the right decision about Brown's statement and decorum, so long as its reason was an honest one. *See Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002) ("[W]e are not concerned with the correctness or desirability of reasons offered for the employment decisions, but rather the issue of whether the employer honestly believes in the reason it offers.").

The only issue before the Court is whether the VA gave "an honest explanation of its behavior." *Debs*, 153 F.3d at 396 (internal citation omitted). Brown must do more at the pretext stage than discredit the VA's reason for its actions; he must show that the VA's reason is a pretext for illegal discrimination. *See Grayson*, 308 F.3d at 820.

Brown cannot meet this standard. He has produced no evidence that Spillner did not believe he made the statement about wanting to hurt a co-worker when she reported the threat to the VA Police and temporarily transferred him to Neurology. *See Merheb*, 267 F.3d at 714 (employee who made threatening statement that caused his co-workers to fear for their safety could not establish that the defendant's legitimate, nondiscriminatory reason for firing him was a pretext, even though the employee did not intend the statement to be threatening); *see, e.g.*, *Miller*, 2007 WL 317028 at *10 (Title VII plaintiff who made threatening comments to a co-worker could not prevail on his argument that his termination was a pretext by his employer, whom he alleged did not believe the threats but used them as a reason to terminate him nevertheless). Indeed, Spillner assumed that the situation would diffuse itself, so she did not act immediately upon hearing the rumor from Bartley, nor did she do anything when Allen confirmed the statement. (R. 16, Def.'s Mem. at 11.) Rather, only after Abney expressed to Spillner that she feared for her life due to prior conflicts with Brown (of which Spillner was aware), and after Human Resources indicated that Spillner was required to follow certain protocol under the VA's Violence in the Workplace Policy, did Spillner proceed in accordance with that policy by reporting the comment to the VA Police for investigation and separating Brown and Abney so as to allow the tension to dissipate. (*Id.*) Brown has not produced a single piece of evidence that his sex was the real motivating factor for any of the VA's actions. *See*

*Hossack*, 492 F.3d at 860 ("An unlawful employment practice is established when a plaintiff demonstrates that a protected characteristic, such as sex, was a motivating factor for an employment decision."). Therefore, the Court finds that the VA's reason for transferring Brown and later disciplining him was not pretextual.

Because Brown cannot establish that a similarly situated employee not in the protected class was treated more favorably than he was, and because he cannot demonstrate that he was meeting his employer's legitimate expectations of him, he cannot establish a *prima facie* case of discrimination as required under the burden-shifting *McDonnell Douglas* method of proof and therefore summary judgment is proper. Even assuming, *arguendo,* that Brown could establish a *prima facie* case of discrimination, he cannot prove that the VA's legitimate, noninvidious reason for taking adverse action against him was a mere pretext for illegal discrimination. Therefore, Brown cannot prove a violation of Title VII using the indirect, burden-shifting method of proof.

Accordingly, because Brown cannot establish a Title VII violation using either the direct or the indirect methods of proof, Brown's disparate treatment claim on the basis of sex in violation of Title VII fails as a matter of law.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (R. 15) is GRANTED. The Clerk of the Court is directed to enter a final judgment in favor of Defendant, Eric K. Shinseki, Secretary of the United States Department of Veterans Affairs.

ENTERED:

**Judge Ruben Castillo**

33

United States District Court

**Dated: September 24, 2012**